

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| GERTRUDIS RODRIGUEZ-JIMENEZ | : | NO. 07-352-3 |

**FILED**

APR ~~~ 0 2009

MICHA~~~~~~~~ Clerk
By~~~~~~~~ Dep. Clerk

## MEMORANDUM

**Gene E.K. Pratter, J.**                                                **April 30, 2009**

## INTRODUCTION

Gertrudis Rodriguez-Jimenez,[1] together with six co-conspirators, is charged with conspiring to distribute, and possession with intent to distribute, significant quantities of methamphetamine in Bucks and Lancaster County between March 2006 and June 2007 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 843(b), and 846. The Government also includes a notice of forfeiture directed to Mr. Rodriguez-Jimenez. Specifically, Mr. Rodriguez-Jimenez is charged in five of the 16 counts in the Second Superceding Indictment.

Mr. Rodriguez-Jimenez has filed an Omnibus Motion Pursuant To Rule 7(C) and 12(B) and (C) which he (1) seeks dismissal of the five counts in the Second Superceding Indictment against him because, he contends, the counts lack the requisite specificity; (2) attacks the search

---

[1] Papers filed in this case present two different spellings of the Defendant's hyphenated last name. The Government, including in the Second Superceding Indictment, refers to Gertrudis Rodriguez-*Jimenez*. Defense counsel's papers refer to Gertrudis Rodriguez-*Jiminez*. For purposes of this Memorandum and Order, the Court will use the spelling that appears in the Second Superceding Indictment, but directs counsel to confer so that clarity as to the correct spelling of the Defendant's name will be forthcoming and used consistently for the remainder of this case.

warrant by which federal agents searched his residence as being supported only by an affidavit "devoid of detailed information," thus allegedly rendering the search warrant, according to defense counsel, no better than a means for conducting an impermissible general search; (3) attacks the search warrant as lacking probable cause to search the Defendant's residence; (4) attacks the search warrant used to search Defendant's place of business, an A&A Mini Market, as lacking a substantial basis to suspect criminal activity at that location; and (5) attacks the search of a brown or tan 2002 Cadillac Sedan DeVille.  Mr. Rodriguez-Jimenez urges suppression of all the evidence retrieved in reliance on the allegedly flawed search warrants and searches.  The Government opposes the Omnibus Motion.

For the reasons outlined below, the Court denies the Motion in all respects except as to the search and seizure concerning the Cadillac, evidence from which will be suppressed at trial unless the Government seeks leave to - - and does - - present evidence pertaining to that search and seizure that meets an appropriate exception for a warrantless search of and seizure from the Cadillac in this specific case.

**FACTUAL BACKGROUND**[2]

According to DEA Special Agent Bruce Muhlberger (the affiant who appeared before the federal magistrate to apply for the search warrants at issue), the Drug Enforcement

---

[2]Because the pending motion focuses on the sufficiency of the probable cause affidavit, and because the parties presented no testimonial or documentary evidence other than the four exhibits attached to the Government's written Response to the Motion (which includes the probable cause affidavit), the factual recitation here comes primarily from DEA Special Agent Muhlberger's probable cause affidavit and the other exhibits.

2

Administration developed information[3] starting in October 2005 concerning methamphetamine trafficking in and around Lancaster County as well as other areas in the Eastern District of Pennsylvania. The information indicated that trafficker Randy Parke primarily secured the methamphetamine from a source initially known as "Angel." "Angel" was subsequently identified as Gertrudis Rodriguez-Jimenez in the course of apparently intensified investigatory activities in 2007. The information marshaled by the DEA indicated that Mr. Parke used his automotive maintenance business in Leola, Pa., as a contact point for the drug trafficking. As part of its investigation of Mr. Parke, the DEA successfully applied for a court-authorized wire intercept order that allowed the authorities to intercept certain of Mr. Parke's cellular phone communications, beginning in November 2006 and continuing to early June 2007.

According to Agent Muhlberger, between March and June 2007 while intercepting Mr. Parke's cell phone communications the investigators developed various information about Mr. Rodriguez-Jimenez, including determining his home and business addresses and seeing him drive a blue BMW (registered to Mr. Rodriguez-Jimenez) and a gold Toyota to and from his house, his mini-market business and other locations, including for meetings with Mr. Parke, associates of Mr. Parke and a person described as a money launderer from Columbia. Specific meetings or calls involving Mr. Rodriguez-Jimenez with Mr. Parke were documented as occurring May 8, May 15 and June 2, 2007. Agent Muhlberger also reported intercepting calls between Messrs. Parke and Rodriguez-Jimenez between May 7 and June 2, 2007. Among the intercepted calls in

---

[3]As recounted in Agent Muhlberger's probable cause affidavit, according to the investigating DEA special agents, the information about the methamphetamine trafficking at issue here was developed from the DEA's previously reliable confidential sources and by DEA and local police surveillance and investigations.

May 2007 were telephone conversations between Mr. Parke and Mr. Rodriguez-Jimenez which were interpreted by the authorities as referencing potential arrangements for a drug transaction between the two conspirators. Agent Muhlberger stated that the DEA received contemporaneous information from a confidential source that Mr. Parke was expecting a significant shipment from Mr. Rodriguez-Jimenez. Officers conducting surveillance observed Mr. Rodriguez-Jimenez meeting Mr. Parke at Mr. Parke's residence on May 15, 2007 and at Mr. Parke's business on May 22, 2007. Phone intercepts indicated that these meetings concerned the expected drug delivery. Ten days later, after a confidential source informed the DEA that Mr. Rodriguez-Jimenez was again at Mr. Parke's business, officers saw the blue BMW leave Mr. Parke's business location and head to Lancaster.

Once arrested on June 2, 2007, Mr. Parke identified Mr. Rodriguez-Jimenez as his source for methamphetamine. He also told the authorities that Mr. Rodriguez-Jimenez did indeed have and use a blue BMW and that Mr. Rodriguez-Jimenez had had to use the Toyota for collateral to secure drugs from a New York supplier. Finally, Mr. Parke also stated that he had gone to Mr. Rodriguez-Jimenez's mini-market business to transact drug-related business with Mr. Rodriguez-Jimenez.

The Agent's affidavit also includes information that in January 2007 a cell phone seized from a drug trafficker arrested in Kansas showed phone contact with Mr. Rodriguez-Jimenez's cell phone. Furthermore, according to the Agent, in November 2007 another co-conspirator in this conspiracy, Troy Pick, also implicated Mr. Rodriguez-Jimenez. Continuing their investigation in the early months of 2008, by which time most of the conspirators other than Mr. Rodriguez-Jimenez had been arrested, the DEA observed that Mr. Rodriguez-Jimenez's mini-

market was frequently closed. The DEA could not locate Mr. Rodriguez-Jimenez's gold Toyota. Undertaking surveillance of the Rodriguez-Jimenez residence in February and March 2008, the DEA observed a Mazda and a tan 2002 Cadillac Sedan DeVille come and go from the house. On one occasion, namely, on April 2, 2008, the law enforcement officers saw Mr. Rodriguez-Jimenez get into the Cadillac, drive to the mini-market, go in and out of the store and meet with an "Hispanic male."

The second superceding indictment issued on April 16, 2008. Mr. Rodriguez-Jimenez was arrested the same day pursuant to a bench warrant, the issuance of which is not challenged. The next day, on April 17, 2008, Agent Bruce Muhlberger presented his affidavit to a federal magistrate, setting out his support for issuance of search warrants for Mr. Rodriguez-Jimenez's residence and business.[4] Agent Muhlberger has been a DEA agent for some 19 years, garnering considerable experience with the activities, habits and practices of narcotics traffickers, including, as Agent Muhlberger's affidavit recounts, traffickers' frequent use of legitimate businesses to conceal their drug activities and use of their residences as "stash" locations for their contraband, as well as for hard copy and electronically stored records pertaining to their drug business and paraphernalia. The federal magistrate judge issued the requested search warrants for both locations.

The searches occurred on April 18, 2008. The authorities also searched a brown or tan 2002 Cadillac Sedan that ostensibly Mr. Rodriguez-Jimenez or his wife owned[5] and that was

---

[4]The residence was located at 51 Cobblestone Drive, Willow Street, Pa. and the mini-market business was located at 306 New Holland Avenue, Lancaster, Pa.

[5]According to the Agent's affidavit, Mr. Rodriguez-Jimenez's wife had "vehicles" (unspecified) which were seen coming and going at the residence and the mini-market. No

mentioned very briefly in the Agent's affidavit.  The searches of the residence, the business and the Cadillac led to the seizure of the following:

- approximately $4,500 in cash from the glove compartment of the Cadillac

- a box of 9 millimeter rounds of ammunition from the bedroom in the residence[6]

- "evidence of both domestic and international travel"  (Location of seizure of this evidence not stated)

- multiple cell phones, pre-paid phone cards and approximately $7,700 in cash from a safe inside the business

- deposits of large amounts of money in a Wachovia Bank business account

- an envelope from Mr. Parke mailed while Mr. Parke was in federal custody at the Federal Detention Center shortly after his June 2, 2007 arrest, addressed to his former girlfriend, "K.D.", with a handwritten note on the outside of the envelope that said, "Angel Call ASAP!!!" and a phone number also written on the envelope known by DEA via the wire intercepts to be used by "K.D."  (Location of seizure of this evidence not stated)

The Government submits that this physical evidence "strongly suggest[s] that defendant was engaged in drug trafficking."

---

information appears in the affidavit or elsewhere as to who on these unspecified occasions actually was driving these vehicles.  Elsewhere in the affidavit, Agent Muhlberger reports that, during February and March 2008, surveillance of the Rodriguez-Jimenez residence documented a Mazda and a tan 2002 Cadillac Sedan "registered to Rodriguez-Jimenez and his wife" come and go from the house.  The driver of either car on any specific occasion was not identified; no mention is made of any passenger in either car at any time.  No other putative ownership or operation information about the Cadillac appears in the record of this case thus far.

[6]No weapon was found.

In addition, according to the Government's Brief on this motion, a drug dog alerted to a bedroom in the residence and in the basement, but no drugs were found.  Also represented by the Government in its Brief, as supplemented by counsel's letter of April 8, 2009, when DEA agents approached Mr. Rodriguez-Jimenez to execute the arrest warrant on April 16, 2008, Mr. Rodriguez-Jimenez had just been picked up by an unknown man driving a vehicle that pulled up next to the Cadillac which was then parked in front of the Rodriguez-Jimenez residence. Counsel represents that Mr. Rodriguez-Jimenez had the keys to the Cadillac at the time of his arrest and that the defendant reportedly "blurted out" that the other man was not involved in anything Mr. Rodriguez-Jimenez did or had done.

## DISCUSSION

### A.    Sufficiency of the Second Superceding Indictment

Mr. Rodriguez-Jimenez claims that Counts 1, 4, 12, 14 and 16 of the Second Superceding Indictment[7] are impermissibly vague and deprive him of constitutional protections. He also argues that the Counts fail to specify any actual criminal conduct by him but, rather, invite only speculation that is insufficient for purposes of charging someone with the commission of a crime.  Thus, Mr. Rodriguez-Jimenez argues that the Second Superceding Indictment does not pass constitutional muster because it fails to "sufficiently apprise [him] of what he must be prepared to meet."  Russell v. United States, 369 U.S. 749, 763 (1962).

_____

[7]Although the ad damnum clause for this part of the defense motion lists only Counts 1, 4, 12 and 16 as subject to the dismissal request, the omission of Count 14 appears to be merely a clerical oversight.  The supporting Memorandum includes a discussion of the alleged shortcomings of Count 14 as well as the other Counts against Mr. Rodriguez-Jimenez. Accordingly, the Court assumes the Motion seeks dismissal of all five Counts against this defendant.

7

The Court disagrees.  The Second Superceding Indictment gives Mr. Rodriguez-Jimenez sufficient notice of the charges against him, setting forth at least two specific drug transactions involving him and describing the role he ostensibly played in distributing methamphetamine to other members of the alleged drug trafficking conspiracy.  Moreover, the charges against Mr. Rodriguez-Jimenez specify particular telephone conversations, locations of personal interactions by him, drug quantities and co-conspirators with whom he allegedly interacted by phone and in person.  Thus, the Court concludes that, as to Mr. Rodriguez-Jimenez, this indictment meets the constitutional thresholds for clarity, specificity and notice to permit the defendant to prepare his defense and guard against risk of double jeopardy.  Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989).  Cf. United States v. Urban, 404 F.3d 754, 771-72 (3d Cir. 2005).  Accordingly, the challenge to the Second Superceding Indictment is denied.

**B.      Motion To Suppress Evidence Seized From Defendant's Residence and Premises**

With respect to Mr. Rodriguez-Jimenez's argument that the search warrants are so overly broad as to constitute unlawful "general warrants," a review of the warrants at issue satisfies the Court that the particularity requirement of the Fourth Amendment for search warrants has been satisfied.  Rather than authorizing unbridled "general exploratory rummaging in [Mr. Rodriguez-Jimenez's] belongings," United States v. Yusuf, 461 F.3d 374, 393 (3d Cir. 2006) (citing Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)), the warrants here did not vest the agents with unrestricted discretion to search for and seize whatever they wished.  Instead, the attachments to the search warrants describe in detail the places to be

searched and the types of documents and other items to be seized.  To be sure, the law enforcement agents cannot (and are not expected to) know with precision the exact records or kinds of apparatus or instruments of crime that may be found - - or the exact nook, cranny, drawer or shelf where the sought after evidence will be.  Therefore, the Court is not obliged to be hyper-technical or overly demanding in its review of the degree of specificity of descriptions of the goods to be seized or the locations to be searched, as long as the descriptions are commensurate with the circumstances.  United States v. Ventresca, 380 U.S. 102, 108 (1965); United States v. American Investors of Pittsburgh, Inc., 879 F.2d 1087, 1106 (3d Cir. 1989).  Here, the descriptions in the search warrants for the Rodriguez-Jimenez house and mini-market were sufficiently focused to meet the requisite standards for upholding their validity.

The defendant also challenges the constitutionality of the April 18, 2008 searches of his house and business premises, essentially because he claims that no search warrants should have been issued, in turn because, he argues, the probable cause affidavit of DEA Special Agent Muhlberger did not justify issuance of the search warrants.  At their root, the argument offered by Mr. Rodriguez-Jimenez is that none of the conduct relating to Mr. Rodriguez-Jimenez as recounted by Agent Muhlberger can be categorized as unambiguously criminal.  Stated differently, Mr. Rodriguez-Jimenez takes issue with the searches because no law enforcement officials state that they saw any criminal conduct by Mr. Rodriguez-Jimenez occur either at his house or at his mini-market business.  Mr. Rodriguez-Jimenez also contends that the search warrants are so overly broad as to be unlawful "general warrants" without a sufficient demonstrable basis for believing instruments or evidence of crime(s) would be located at the places to be searched.  Indeed, Mr. Rodriguez-Jimenez suggests that these search warrants were

9

so lacking that the law enforcement authorities who conducted the searches ought not even be extended the benefits of good-faith reliance on the issuance of the search warrants pursuant to United States v. Leon, 468 U.S. 897 (1984).  See United States v. Hodge, 246 F.3d 301 (3d Cir. 2001).  In essence, Mr. Rodriguez-Jimenez is arguing that the "four corners" of the probable cause affidavit presented to the magistrate were too anemic to justify the issuance of the search warrants.

The Court may not engage in a de novo review of the magistrate's determination that probable cause was presented.  United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000). Indeed, the Court is constrained to approach the decision to issue the search warrants with "great deference" for purposes only to ensure that the issuing authority "had a substantial basis for concluding that probable cause existed."  United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993); see also Illinois v. Gates, 462 U.S. 213, 236 (1983); Spinelli v. United States, 393 U.S. 410, 419 (1969); United States v. Kepner, 843 F.2d 755, 762 (3d Cir. 1988).

The Third Circuit Court of Appeals has embraced an even more indulgent standard by describing the "substantial basis" standard as requiring the reviewing court to "determine only whether the affidavit provides a sufficient basis for the decision the [issuing authority] actually made."  United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993).  When in doubt, according to the Supreme Court, the reviewing court should resolve the issue "largely" by acknowledging "the preference to be accorded to warrants."  Gates, 462 U.S. at 237 n.10 (citation omitted).  Moreover, this Court is obliged to consider the "totality of the circumstances," including the affiant's training and experience, the information recounted and the practicality of the common sense decision made by the issuing authority as to whether there was a "fair

probability that contraband or evidence of a crime [would] be found in a particular place." Id.

Here, Special Agent Muhlberger, the affiant who presented the warrant application, possessed the extensive pertinent expertise that would allow the federal magistrate to credit the Agent's opinions that evidence of drug trafficking likely would be found at Mr. Rodriguez-Jimenez's residence and business. See Whitner, 219 F.3d at 299.  Agent Muhlberger attested to the DEA having received specific information supplied by a reliable confidential source and having documented through wire intercepts and on-site surveillance even more precise information about Mr. Rodriguez-Jimenez and his interactions with Randy Parke concerning the supplying by Mr. Rodriguez-Jimenez of large quantities of methamphetamine. Thus, the likelihood of Mr. Rodriguez-Jimenez's involvement in drug trafficking is present in the affidavit.  Randy Parke himself confirmed that he had transacted illegal drug business with Mr. Rodriguez-Jimenez at the mini-market.  Officers saw Mr. Rodriguez-Jimenez drive at least one of his vehicles between his home and Mr. Parke's location where Mr. Parke allegedly conducted his drug business.  Thus, both the home and the business had been implicated in the defendant's activities with Mr. Parke.

Defense counsel emphasizes that surveillance officers apparently did not actually see any unambiguously illegal conduct by Mr. Rodriguez-Jimenez.  However, it was not necessary that the facts recounted in the probable cause affidavit constitute direct proof of a crime.  It can be sufficient for purposes of finding probable cause to infer probable cause by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." Jones, 994 F.2d at 1056 (quoting United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985)); see also United States v. Williams,

11

124 F.3d 411, 420 (3d Cir. 1997).  The accumulated information that is presented in Agent

Muhlberger's affidavit, including his in-depth recitation of the habits and practices of persons in

the drug trafficking business, provided the magistrate with a sufficient considered basis to

reasonably and rationally accept the Agent's experienced belief that evidence of illegal drug

activities likely would be found at the 51 Cobblestone Drive, Willow Street, Pennsylvania and

306 New Holland Avenue, Lancaster, Pennsylvania premises.  See United States v. Burton, 288

F.3d 91, 103 (3d Cir. 2002); Hodge, 246 F.3d at 307; Whitner, 219 F.3d at 297-98.[8]

### C.    Motion To Suppress Evidence Seized From The Cadillac

Finally, Mr. Rodriguez-Jimenez seeks to suppress the fruits of the search of the

2002 Cadillac following his arrest.  Defendant argues that the probable cause affidavit makes

virtually no material mention of the Cadillac at all, although other cars are more intricately tied to

observed conduct by Mr. Rodriguez-Jimenez.  Ownership of the Cadillac is not alleged to be

exclusively Mr. Rodriguez-Jimenez's; his wife is apparently a co-owner.  Mr. Rodriguez-Jimenez

was not seen using the Cadillac to meet with any of the co-conspirators.  The Cadillac is not

expressly listed in the Notice of Forfeiture.  There is no information in the record as to when or

under what circumstances the Rodriguez-Jimenez's obtained the Cadillac.  Mr. Rodriguez-

---

[8]Even if the Muhlberger probable cause affidavit was deficient, the fruits of the search at
either the Cobblestone Drive or New Holland Avenue locations should not be suppressed on the
strength of the "good faith" exception to the exclusionary rule enunciated by the Supreme Court
in United States v. Leon, 468 U.S. 897 (1984).  If the Court had not concluded that these
warrants were properly issued, the record here contains no factual or advocated basis on which to
"objectively ascertain" that the law enforcement officers who served these search warrants would
have or could have - - or even should have - - "known that the search [of Cobblestone Drive or
New Holland Avenue] was illegal despite the [magistrate's] authorization."  Leon's "good faith"
exception to the exclusionary rule would be available as a basis on which to deny the suppression
motion as to those searches.

Jimenez also argues that the Government cannot justify the search of the Cadillac as a search incident to arrest, under an "inevitable discovery" theory, or as an inventorying function either independent of or as part of the forfeiture process.

      The Government argues in response that "the agents clearly had probable cause to believe that the [Cadillac] contained evidence of drug trafficking."   However, the record contains no such evidence - - clear or otherwise.  Agent Muhlberger's affidavit discloses nothing arguably connecting the Cadillac to the material events recounted in the affidavit.  He did not request the magistrate to include the Cadillac in the search warrants sought.  No linkage is suggested by any evidence presented to this Court between the Cadillac and any of the cars in which Mr. Rodriguez-Jimenez was reportedly observed interacting with his alleged co-conspirators.  Indeed, as the defense papers hasten to point out, there are some ten months between the June 2, 2007 surveillance of Mr. Rodriguez-Jimenez visiting Mr. Parke (as to which there is no mention of the Cadillac) and the April 18, 2008 arrest of Mr. Rodriguez-Jimenez and search of the Cadillac.  In the interim, according to the Agent's affidavit, the only observations, or even comments relating to Mr. Rodriguez-Jimenez, are the DEA's efforts in January 2008 to locate the gold Toyota Mr. Rodriguez-Jimenez previously had been seen using, the February 2008 observation that the Rodriguez-Jimenez mini-market was frequently closed, the February and March 2008 surveillance of the Rodriguez-Jimenez house where two cars (a Mazda and the Cadillac, both reportedly registered to Mr. and Mrs. Rodriguez-Jimenez) were observed coming and going (but no specific driver or passengers were noted in the affidavit), and an April 2, 2008 report that Mr. Rodriguez-Jimenez was observed driving the Cadillac to the mini-market where he went into and then left the store and met with an "Hispanic male."

13

None of the arguments the Government endeavors to use in order to shoehorn the search of the Cadillac into a realm of constitutional acceptance is availing, even if the Court treats for present purposes many of the facts or factual conclusions called upon for counsel's arguments as having been actually presented in an evidentiary hearing or as an unobjected to offer of proof.[9] There is no reason to surmise that officers reasonably believed that when Mr. Rodriguez-Jimenez was arrested he could have availed himself of any instrumentality in the Cadillac that would have put arresting officers in danger or that they believed the Cadillac contained evidence of a crime at that time. See Arizona v. Gant, __ U.S. __, No. 07-542 (April 21, 2009). Surveillance did not document use of the Cadillac by Mr. Rodriguez-Jimenez for any suspected drug trafficking transaction. He was not in the Cadillac when he was arrested. No information of a possible trail of drugs or trafficking business paraphernalia through the Cadillac at any time has been presented. Ownership and use of the car apparently does not reside exclusively in this defendant. When the Rodriguez-Jimenez's obtained the Cadillac is not known.

Recognizing that this warrantless search is problematic from a Fourth Amendment standpoint, the Government suggests an alternative justification using the Notice of Forfeiture

---

[9]The Government's arguments on this issue necessarily call upon certain factual underpinnings that have not actually been presented to the Court, other than in counsel's briefing and supplementary letters. For example, even Mr. Rodriguez-Jimenez's alleged "close proximity to the Cadillac at the time of the arrest and his possession of the vehicle's keys" is not a matter of record in this proceeding. Likewise, no law enforcement personnel actually testified as to the thought process employed to proceed with a search of the Cadillac. These are only posed by counsel in a letter to the Court. Of course, the Court is not suggesting that counsel is misstating his understanding of what testimonial evidence would support - - and it bears mention that defense counsel has made no argument based upon the deficiency of the actual record in this regard or on the basis that any of the Government's factual assertions are not accurate. However, where, as here, the potential justification for a search demands such a stretch of factual findings, law enforcement on-site judgment calls and application of conventional case law, the inadequacy of supporting record information is more than a technical matter to be presumed away.

appended to the Second Superceding Indictment.  Counsel states that Agent Muhlberger has advised counsel that at the time Mr. Rodriguez-Jimenez was arrested, the Agent seized the Cadillac for forfeiture purposes pursuant to the forfeiture provision in the indictment which contains a substitute asset clause.  Counsel goes on to say that the Agent also advised counsel that the BMW he had intended to seize pursuant to the forfeiture notice "had disappeared and the Cadillac appeared to be the new vehicle being used by the defendant."  On this basis, the Government argues that any material seized from the Cadillac is admissible because the search was lawful as part of the inventory process pursuant to the forfeiture-related seizure.

> In addition to the Court's consternation over the absence of actual evidence about the Agent's thought processes as mentioned in footnote 9, <u>supra</u>, the proffered explanation from the letter appears to be at least potentially inconsistent with some of the information in the Agent's affidavit.  At least the Court - - and perhaps defense counsel - - would want the opportunity to clarify with the Agent on the witness stand some potentially confusing features of the chronology at issue here regarding the various cars and other event sequences.

> Finally, the Court is not prepared at this point to make all of the factual and legal leaps that would be necessary to allow the potential - - and at this point it is nothing more than a theoretical potential[10] - - for the invocation of the substitute asset clause in an extensive Notice of Forfeiture in an indictment to serve as a new functional exception to the Fourth Amendment's search and seizure protections.

> Although the Court is granting the suppression motion as to the fruits of the search

---

[10]At this juncture, for example, it is not clear that any forfeiture will ever be authorized; that, if forfeiture is appropriate, the listed assets will or will not be sufficient; or that the Cadillac is an appropriate "substitute asset," among other prerequisites.

of the Cadillac, it is without prejudice to the Government to ask the Court to revisit the issue if and when - - without impeding the expected start of this trial - - the presentation of relevant evidence may be made.

## CONCLUSION

An Order consistent with this Memorandum follows.


BY THE COURT:

GENE E.K. PRATTER
United States District Judge

16